UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| FAYE R. GREY,<br><br>        Plaintiff,<br><br>        v.<br><br>KIRKLAND & ELLIS, LLP, an<br>Illinois limited liability partnership,<br><br>        Defendant.<br><br>TAMMI P. BOWDEN,<br><br>        Plaintiff,<br><br>        v.<br><br>KIRKLAND & ELLIS LLP,<br><br>        Defendant,<br><br>NANCY J. GAGEN,<br><br>        Plaintiff,<br><br>        v.<br><br>KIRKLAND & ELLIS LLP,<br><br>        Defendant. | No. 07 C 975 (consolidated with Case Nos. 07 C 978 and 07 C 979)<br><br>Judge Rebecca R. Pallmeyer |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs, two former employees and one unsuccessful job applicant of Chicago-based law firm Kirkland & Ellis LLP ("Kirkland"), assert various employment discrimination claims against the firm.[1] In addition, all three Plaintiffs accuse Kirkland of engaging in the systematic interception and surveillance of their private telephone conversations in violation of the Electronic Communications

---

[1] Plaintiffs' various employment discrimination claims, which present distinct legal and factual issues, are addressed in companion opinions issued today.

Privacy Act ("ECPA"), 18 U.S.C. § 2510 *et seq.*, and the Illinois Eavesdropping Act, 720 ILCS 5/14-2. Plaintiff Tammi Bowden recalls that she took care not to make personal phone calls from her office phone at Kirkland. Yet numerous personal calls appear in Kirkland's phone bills rather than in Ms. Bowden's cell phone bills, where she expected to see them. From these circumstances–and these alone–Ms. Bowden and her co-Plaintiffs conclude that Kirkland violated federal and state law by eavesdropping on her personal conversations. Kirkland seeks summary judgment on these claims, and because Plaintiffs have failed to produce any non-speculative evidence that Defendant did, in fact, engage in eavesdropping, the motion is granted.

## **BACKGROUND**

Plaintiff Tammi Bowden is an African-American woman who was employed as a legal secretary at Kirkland between December 1996 and February 2007. Plaintiff Nancy Gagen is a Caucasian woman who was employed as a document specialist at Kirkland between March 2002 and March 2006. Plaintiff Faye Grey is an African-American woman whose two applications for employment at Kirkland in June 2004 and May 2005 were both rejected. (Def.'s 56.1 Stat. at ¶ 2.) During the relevant periods, both Bowden and Gagen worked in Kirkland's document support services department, where they were supervised by Leah Quinlisk and Donna Amos. (Pl.'s 56.1 Resp. at ¶ 3.) Bowden, Gagen, and Grey are friends who, during the time period in question, regularly engaged in personal telephone conversations with one another to discuss their shared grievances against Kirkland and the pendency of a discrimination charge that Bowden filed against the firm with the Equal Employment Opportunity Commission ("EEOC") in early October 2005.[2] (Pl.'s 56.1 Stat. at 2.)

In September 2005, Bowden testified, she "began to suspect or had a sneaking suspicion"

---

[2] Bowden and Gagen worked different shifts at Kirkland, and Grey worked at another Chicago-area law firm. As a result, the Plaintiffs' most regular mode of communication was the telephone. It appears that Gagen typically called Bowden from her home. It is not clear whether Grey's calls most often originated from her workplace, home, or cellular telephone lines.

that Kirkland was monitoring the land-line telephone in her workspace. (Pl.'s Resp. at ¶ 9; Bowden Dep. at 320-22.)[3] Motivated by these suspicions, Bowden resolved to refrain from using her desk phone and began using her private cell phone to conduct personal calls while at work. (*Id.*) According to Bowden, after September 2005, she conducted almost all of her personal calls on her cell phone. Bowden acknowledged, however, that she still made or received occasional personal calls from her desk phone if, for example, she was temporarily unable to get a cell phone signal or if she was only making a quick call. (Bowden Dep. at 321-23.) Bowden estimated that she made or received between 10 and 20 calls per day; she acknowledged that she could not remember every personal call she made during this period. (*Id.* at 353.) Bowden's cell phone at the time was a Nokia 6010 GSM digital phone. The signal of a digital cell phone is encrypted, and the parties do not dispute that "[i]t is virtually impossible to intercept a digital phone without possessing sophisticated equipment and technical expertise." (Pl.'s Br. at 5.)

On or around September 27, 2005, Bowden and Gagen agreed that any conversation between them would be conducted using Bowden's cell phone in order to circumvent any possible

---

[3] Bowden attributes her suspicions to a conversation she had with a non-party former employee of Kirkland who allegedly told Bowden that the firm was capable of monitoring telephone calls and e-mails sent over the firm's systems. The employee's basis for these assertions is unclear. Bowden admits that no Kirkland employee familiar with the firm's telecommunications operations ever actually told her that the firm was monitoring her communications or that the firm had the capacity to do so. (Bowden Dep. at 330.) The court notes parenthetically that, had Plaintiffs' claim been limited to the monitoring of Bowden's work telephone line, it might have fallen under the business use exception of the federal wire tapping statute, which exempts monitoring of communications occurring in the ordinary course of an employer's business. 18 U.S.C. § 2510(a)(i); *Sanders v. Robert Bosch Corp.*, 38 F.3d 736, 739-42 (4th Cir. 1994). As other courts have recognized, the monitoring of employees' job-related communications is increasingly the norm in the American workplace. *See e.g. United Stated v. Ziegler*, 456 F.3d 1138, 1145 (9th Cir. 2006) ("[M]ore than three-quarters of this country's major firms monitor, record, and review employee communications and activities on the job, including their telephone calls, e-mails, Internet connections, and computer files.") The business use exception is not relevant here, however, because Plaintiffs' claims are based on the alleged interception of personal telephone calls made over a private connection.

3

monitoring by Kirkland.[4] (Pl.'s 56.1 Resp. at ¶ 10.) Bowden gave similar instructions to Grey. Nevertheless, Grey and Gagen did continue to call Bowden's desk phone on rare occasions. "[Gagen] made a few mistakes after [September] 27th," Bowden testified. "[A] few calls where I quickly got her off the phone, but with the exception of maybe one call in September that was two minutes or so and one in early October, she never called me on my land line except probably a few instances where she was trying to track me down and never got me . . . ." (Bowden Dep. at 322.) Bowden remains adamant in asserting that, with the limited exceptions stated above, she stopped using her desk phone almost entirely and used her cell phone whenever she made outgoing personal calls to either Gagen or Grey. (Pl.'s 56.1 Stat. ¶ 4-5.)

Bowden believes that, between October 2005 and June 2006, Kirkland intercepted and eavesdropped on the calls she made from her cell phone whenever she was sitting at her workstation in Kirkland's offices. (Pl.'s 56.1 Resp. at ¶ 15.) She bases her contention, in part, on what she perceives to be discrepancies in her monthly cell phone bills. (*Id.* at ¶ 18.) Omissions in Bowden's billing information, Plaintiffs urge, demonstrate that "something is not Kosher at Kirkland & Ellis LLP." (Pl.'s Resp. at 2.) Precisely what that something is, however, remains elusive. Bowden herself admitted that she is unclear about how or why Kirkland actually went about intercepting her calls. When asked her basis for the interception allegations, Bowden responded: "I have no idea. I just know that my Cingular [cell] phone activity was not reflected by Cingular's phone records and only when I was at my workstation." (Bowden Dep. at 327.) As the court understands it, Plaintiffs' contention is as follows: according to Bowden, many of the calls that she dialed or received on her cellular phone between October 2005 and June 2006 are not

---

[4] Bowden admitted that there was also another motivation for her decision to use her cell phone to place personal calls. In late September 2005, Bowden received a disciplinary "final warning" from the law firm, informing her that she risked dismissal if she engaged in "excessive use" of Kirkland's telephone system to place personal calls. (Bowden Dep. at 321-22.) "I took that to heart very seriously after the final warning," Bowden testified. (*Id.* at 322.)

4

accurately reported on her monthly cell phone billing records.  Specifically, the bills omit entirely every call that Bowden claims to have made or received on her cell phone while she was sitting in her workspace.  (Bowden Decl. at ¶ ¶ 13, 18.)  The omitted calls allegedly include several telephonic conversations between Bowden and the other Plaintiffs, in which Plaintiffs discussed their general dissatisfaction with the firm and Bowden's pending EEOC complaint.  The omitted calls also allegedly include dozens (or perhaps hundreds) of personal calls that Bowden placed to her boyfriend, her neighbor, her brother, her therapist, the man who painted her condo, the developer of her condo complex, and many others.  (Pl.'s Ans. to Second Set of Interrog.)  Significantly, several of the calls that are allegedly omitted from Bowden's cell phone bills instead appear on Kirkland's internal telephone records, reported there as having originated from or terminated at the land-line telephone on Bowden's desk.  Based on her memory of having placed the telephone calls only from her cell phone and her professed habit of deliberately avoiding use of her workspace telephone, Bowden asserts that Kirkland's internal telephone records are erroneous and reflect calls that she did not actually make using the firm's telephone system.  (Bowden Dep. 311-21.)

Plaintiffs claim that the absence of cellular billing records for calls purportedly placed on Bowden's cell phone and the erroneous reporting of these same calls on Kirkland's internal records are "anomalies" that cannot be innocently explained.  (Pl.'s 56.1 Stat.at ¶ 41.)[5]  Plaintiffs infer from these apparent anomalies that Kirkland somehow intercepted Bowden's cell phone signal, removed

---

[5] There is at least one possible alternative explanation: that Bowden has simply confused whether she placed or received the disputed personal calls from her cell phone or the land-line telephone on her desk.  Someone who makes between 10 and 20 personal calls per day over the course of roughly ten months might be forgiven for not remembering which telephone she used to place some of those calls.  Bowden has testified unequivocally, however, that she did not and could not have placed or received the anomalous calls from the land-line telephone, and the court will credit that testimony on summary judgment.  (Bowden Dep. at 311-21.)  As the court explains below, however, the mere presence of a suspicious discrepancy is not enough to sustain Plaintiffs' claim that Kirkland intentionally eavesdropped on Plaintiffs' private telephone conversations.

5

Bowden's calls from the network of her cellular carrier (Cingular Wireless), and rerouted the signal through the firm's internal telecommunications system. (Bowden Dep. at 301-02.) Plaintiffs themselves recognize that such an interception would require tremendous technological sophistication, but they nevertheless insist that it is "theoretically possible." (Pl.'s Stat. at ¶ 41.)

Referring to the apparent inconsistency in the billing records, Gerald Christensen, a wireless-systems engineer retained by Plaintiffs, opined that "based on various highly unusual call anomalies that cannot be explained by normal wireless telecommunications call signaling, processing and routing, there is a reasonably high probability that call interception of some type and through some method occurred . . ." (Christensen Decl. at ¶ 2; Christensen Report of 12/22/09 at 3.) Christensen did not explain what precisely he meant by the phrase "reasonably high probability," but in his deposition he stated that he had "satisfied [himself] that there was some forensic evidence, let's call it, that could indicate the potential for interception may have occurred." (Christensen Dep. at 37.) The "forensic evidence" to which Christensen referred appears to be the billing records, which Christensen concluded "do not reflect call details in accordance with Bowden's actual phone usage or call activity." (Christensen Report of 12/22/09 at 5.) This evidence, Christensen opined, "merit[ed] further investigation to verify if said interception occurred . . ." (*Id.* at 4.) That Christensen called for "further investigation" satisfies the court that he was unable, from his review of records, to "verify" Plaintiffs' allegations of interception.

Christensen further hypothesized that it would be possible for an entity to intercept digital cellular phone calls in the manner Plaintiffs allege by using one of two devices: an International Mobile Station Identifier ("IMSI") catcher or a GSM interceptor (or "sniffer"). (*Id.* at 49-54.) Christensen testified that these devices are typically used by governments and law enforcement agencies, and that they are not available to the general public. (*Id.* at 54-58.) Christensen speculates that it is nevertheless "conceivable" that an entity like Kirkland could obtain such a device on the black market: "[O]f course, again, this is speculation on my part and I shouldn't

provide testimony on speculation, but I would presume that it's conceivable that somebody could obtain one [of these devices] if they were not a lawful organization if they went to one of these [overseas sellers of the devices]." (*Id.* at 69.) Christensen explained that his conclusion was based on his "gut reaction" to marketing materials for such devices that he found on the internet. (*Id.* at 70-71.) Plaintiffs state that they "now believe[] defendant used a an [sic] IMSI catcher/GSM interceptor (sniffer) to intercept and eavesdrop on [Plaintiffs'] calls . . ." (Pl.'s Resp. at ¶ 28.) Based on the technical limitations of such a device, Plaintiffs posit that the IMSI catcher or sniffer was covertly located somewhere proximate to Bowden's workspace, though Plaintiffs admit that none of them ever saw or heard of such a device in use at Kirkland. Kirkland's unlawful eavesdropping, Plaintiffs speculate, was apparently motivated by the firm's concern over Bowden's EEOC charge and her various internal complaints against her supervisors.

Plaintiffs also assert that Kirkland separately intercepted calls terminating at a land-line telephone in Gagen's home by apparently colluding with Gagen's telephone service provider, AT&T. According to Plaintiffs, AT&T's records reveal that the company routed specific calls to Gagen "in an indirect, suspicious manner that was different from the way other similar calls had been routed during that same time. Those incoming calls were only from African-American employees and an African-American job applicant of Kirkland & Ellis." (Bowden Decl. at ¶ 29.) The records referred to by Plaintiffs record the series of switches in the AT&T network that were automatically used to connect a given call. John DeWitte, a telecommunications engineer retained by Plaintiffs, stated that the switching records "appear[]" to show "some discrepancies regarding the routing of particular calls [to Gagen's home] in relation to other seemingly similar calls." (De Witte 12/22/09 Report at 5.) Specifically, DeWitte found, certain calls from Bowden's cell phone to Gagen's home land line "could have been routed differently than other calls with similar dialing characteristics." (Id. at 7.) "While it is [AT&T's] prerogative as to how they choose to route calls through their network, " DeWitte stated, "it would seem logical that similar calls would route in a similar manner." (*Id.*) In

De Witte's view, AT&T's switching records did not adequately explain "why seemingly similar calls [to Gagen's home land line] were routed differently." (*Id.*) Plaintiffs interpret these routing "discrepancies" as evidence that AT&T, Kirkland, or both somehow diverted specific calls to or from Gagen's home. Plaintiffs do not explain, however, why AT&T would abet Kirkland's unlawful surveillance of an AT&T customer or how the company could possibly have known the race of the party originating the rerouted telephone calls. Nor do Plaintiffs appear to contemplate whether there are innocuous explanations for the switching patterns. Instead, Bowden intimates that AT&T is directly implicated in the wrongdoing; as evidence, she points out that AT&T "has strategically delayed its responses to plaintiffs' subpoenas over the course of this litigation." (*Id.*) DeWitte acknowledged, however, that he had not seen any evidence to connect AT&T's routing decisions with interference of any kind by Kirkland. (DeWitte Dep at 221; 234-34.) DeWitte testified, "with the information that I've been provided that I've seen, you know, there is nothing– there is nothing that I'm aware of that even mentions Kirkland." (*Id.* at 95.)

Plaintiffs nevertheless remain certain that Kirkland was spying on their phone calls. They point to an e-mail exchange between Kirkland employee Lynn Tilton and Quinlisk, Plaintiffs' supervisor. In that e-mail exchange, Tilton stated that she received "an unusual phone call yesterday from Nancy Gagen." (Pl.'s 56.1 Resp. at ¶ 31.) "Nancy talked about political issues [regarding management at Kirkland] that I just couldn't follow or keep up with but your [Quinlisk's] name also came up," Tilton wrote. "I'm very concerned about this woman's intentions. I don't have anything against Nancy but cannot understand why she would want to communicate these types of issues to anyone[,] especially someone outside the K&E firm." ( Ex. 4 to Gagen Dep.) At the time, Tilton was working at Vedder Price, another Chicago-area law firm.

Gagen admits that she spoke with Tilton on the phone the day before Tilton sent the e-mail, but she denies ever conveying the information recounted in Tilton's e-mail. (Gagen Dep. 212-13.) Specifically, Gagen denies that she shared with Tilton her complaints about Quinlisk, Amos, and

her other supervisors at Kirkland. That information, Gagen testified, "was completely absolutely never discussed in any way, shape[,] or means with Lynn Tilton." (*Id.* at 213.) Instead, Plaintiffs contend, the information could only have been learned by eavesdropping on private conversations between Gagen and Bowden. Bowden speculates that it was "likely Leigh Quinlisk" herself who disclosed the allegedly intercepted conversations to Tilton. Again, Plaintiffs admit that they have no evidence to support that speculation. (Pl.'s 56.1 Resp. at ¶ 34.) So far as the court is aware, neither side took Ms. Tilton's deposition. For her part, Ms. Quinlisk testified that she never eavesdropped on any of Plaintiffs' calls and never told Tilton what information to put in her e-mail. (Id. at ¶ 57; Quinslisk Dep. at 361-62.) Nor did Quinlisk know of any efforts to listen to or intercept Plaintiffs' calls. (*Id.*)

Grey, who also works at Vedder Price, believes that her cell phone calls to Bowden during this period were also intercepted, but Grey, too, admits that she has no personal knowledge of how or why Kirkland intercepted her calls. (*Id.* at ¶ 49; Grey Dep at 175-78.) Like Bowden, Grey bases her belief primarily on the discrepancies in Bowden's billing records. (*Id.* at 181.) Plaintiffs do not explain what motivation either Tilton or Vedder Price would have had to participate in Kirkland's alleged covert surveillance of Plaintiffs.

Plaintiffs reported their suspicions to Cingular Wireless, AT&T, the Illinois Citizens Utility Board, the Federal Bureau of Investigation ("FBI"), the United States Attorney's Office for the Northern District of Illinois, and Kirkland's General Counsel James Schink. Schink testified that upon receipt of Plaintiffs' complaint, he initiated an investigation into whether Kirkland did or could have intercepted the phone calls as alleged. (*Id.* at ¶ 60, Schink Dep. at 22-28.) His review of Kirkland's purchasing records and consultations with Kirkland's telecommunications and technology staff, Schink testified, confirmed that the law firm did not possess any equipment that would have permitted it to intercept private telephone calls. (Schink Dep. at 22-26.) He further reported that he had found no evidence that Kirkland had done or was capable of doing the things Plaintiffs

9

alleged.  (*Id.* at 26.)  At the time of the alleged wiretapping, the basic telephone system in Kirkland's Chicago office was almost 17 years old and was not itself capable of intercepting calls.  (Pl.'s 56.1 Resp. ¶ 53-55.)[6]

Kirkland's Telecommunications manager Paula Graller also testified that she and her staff "took [Plaintiffs' complaints and the subsequent investigation] very seriously" but ultimately concluded that Kirkland's telecommunications technology was simply incapable of intercepting telephone calls as Plaintiffs alleged.  (Pl.'s 56.1 Resp. ¶ at 63; Graller Dep. at 107-09.)  Gary Beu, Kirkland's Chief Human Resources Officer, similarly testified that Kirkland did not own or use any of the equipment that would have been required to intercept phone calls, and that "it was inconceivable to [him] why [Kirkland] would even consider [intercepting telephone calls]."  (Beu Dep. at 222-23.)  In August 2006, Schink informed Plaintiffs that his investigation revealed no evidence to support their allegations and stated that Kirkland "unequivocally denies that it intercepted any telephone calls to or from any of its employees."  (Pl.'s 56.1 Resp. at ¶ 66; Schink Dep. at 27-29.)  Plaintiffs assert that Kirkland's internal investigation was inadequate and theorize (without providing evidence) that Graller and her telecommunications team may themselves have actually participated in the initial interception of Plaintiffs' phone calls.[7]  Graller testified that her team was never directed to gain, nor did it ever have, access to Bowden's cell phone.  (Pl.'s 56.1 Resp. at ¶ 58.)

Plaintiffs come to similar conclusions about independent investigations performed by Cingular Wireless and AT&T, which also found no indication that any calls were intercepted. Cingular Wireless's investigation in response to Bowden's complaints concluded: "There was no

---

[6]  While Plaintiffs acknowledge this fact, they nevertheless suspect that the basic telephone system was somehow augmented or bypassed with the sophisticated technology required for intercepting phone calls.  (Pl.'s 56.1 Stat. at ¶ 19-21.)

[7]  *See* Pl.'s 56.1 Resp. at ¶ 60: "[P]laintiffs deny that Kirkland's investigation was sufficient . . . The investigation was not conducted by an independent third party.  It was conducted instead by the only employees of defendant who had the ability to carry out the alleged interception."  (internal record citation omitted.)

indication that any calls to or from your cell phone were intercepted." (Pl.'s 56.1 Resp. at 70.) Robert McHugh, an employee of AT&T Midwest, testified that the automated call records "do not reveal any human agency including interception." (McHugh Dep. at 153.) Plaintiffs contend that these investigations were inadequate. They cite Dewitte's statement that "[a]ny interception of cell phone calls . . . cannot be determined, let alone conclusively, from a review of subscriber billing records only." (DeWitte Decl. ¶ 4.) According to DeWitte, a thorough review of the call switching and routing records for Bowden's cell phone "would be required for any effective or conclusive investigation of her complaint of interception." (*Id.*) As stated above, however, DeWitte's own investigation may be characterized, at best, as inconclusive with respect to Kirkland's participation in any interception of Plaintiffs' calls. Plaintiffs purport to be awaiting a more thorough investigation by the FBI. Though she previously testified that the FBI initially turned her away until she produced more evidence, Gagen now states that the FBI informed her in February 2009 that it would conduct an investigation into the interception charges. (Gagen Dep. at 218; Gagen Decl. ¶ 14.)[8] There is no evidence that the FBI or the United States Attorney's Office has pursued any charges in connection with this matter.

## **DISCUSSION**

Plaintiffs' claims are, on their face, improbable. Essentially, Plaintiffs allege that a nationally prominent law firm engaged in a sophisticated conspiracy, deliberately violated the law, and employed expensive cloak-and-dagger technology, all in an effort to eavesdrop on the private conversations of two legal secretaries and an unsuccessful job applicant. Plaintiffs themselves

---

[8] Kirkland contends that Plaintiffs' assertion that the FBI is conducting an investigation is insufficiently supported by the record. (Def.'s Reply at 4-5.) Kirkland notes that Gagen's post-deposition declaration is the sole source for this assertion and that Plaintiffs have never produced the e-mail in which the FBI supposedly indicated that it planned to undertake an investigation. In any event, Gagen's statement with respect to the conduct of an FBI investigation is hearsay, and it will be disregarded.

acknowledge that their claims are the stuff of a John Grisham novel. (Pl.'s Br. at 4.)[9] Nevertheless, for purposes of summary judgment, the "*evidence* of the non-movant is to be believed, and all justified inferences are to be drawn in [the non-movant's] favor . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (emphasis added); *Lewis v. Downey*, 581 F.3d 467, 472 (7th Cir. 2009). Under Rule 56(c), summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c). Thus, while the court draws all reasonable inferences in Plaintiffs' favor, Plaintiffs may not simply rest on the unsupported allegations of their pleading. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Instead, they must present evidence that is sufficient to establish a triable issue of fact on all essential elements of their claims. *Id.* at 322-23. This means Plaintiffs cannot avoid summary judgment merely by asserting that the other side is lying. *See Rand v. CF Industries, Inc.*, 42 F.3d 1139, 1146 (7th Cir. 1994). Rather, they must set out specific facts that cast doubt on Defendant's evidence and show a genuine issue for trial. *Id.*; FED.R.CIV.P. 56(e). As explained below, Plaintiffs have not produced sufficient evidence to support their eavesdropping claims. This failure of proof–not the facial implausibility of the allegations–compels the court to grant Defendant's motion.

I.      **The Alleged Spoliation of Evidence**

Before turning to the merits, the court addresses Plaintiffs' allegation that Defendant has deliberately destroyed or failed to preserve evidence that would have been necessary to prove

---

[9] Indeed, the young protagonist of Grisham's best-selling work THE FIRM (1991) ultimately discovers that his law-firm employer is covertly eavesdropping on his private conversations in an effort to prevent the young lawyer from exposing the firm's assorted nefarious deeds to the FBI. The book was made into a popular film in 1993. See Plot Summary, http://www.imdb.com/title/tt0106918/plotsummary (last visited September 2, 2010). Whatever the merits of their employment claims, Plaintiffs have not suggested that they had access to any secrets that Kirkland was so desperate to protect as did the fictitious firm of Grisham's novel.

12

Plaintiffs' claims. This court has discretion to sanction discovery violations such as the non-production of evidence. *See Park v. City of Chicago*, 297 F.3d 606, 614 (7th Cir. 2002). As a prerequisite to sanction, however, Plaintiffs must show that the destruction of evidentiary materials reflects bad faith. *See Trask-Morton v. Motel 6 Operating L.P.*, 534 F.3d 672, 681 (7th Cir. 2008); *Rummery v. Illinois Bell Telephone Co.*, 250 F.3d 553, 558 (7th Cir. 2001) ("[T]o draw the inference that the [destroyed] records favored [the plaintiff] requires us to conclude that the documents were destroyed in bad faith, i.e., that the document destruction was for the purpose of hiding adverse information.") (internal quotation omitted). Plaintiffs have made no such showing here.

In their *pro se* response brief, Plaintiffs contend that Kirkland was "grossly and/or intentionally negligent in its electronic discovery obligations to ensure that Plaintiffs cannot prove their case." (Pl.'s Br. at 2.) In April 2007, Plaintiffs filed an emergency motion in this court to initiate discovery on their claim that Kirkland had intentionally intercepted their telephone calls. The court granted that motion on May 1, 2007. (D.E. 17.) Plaintiffs assert that, in December 2007, Kirkland employees destroyed a computer server that contained stored electronic records of phone calls made from the firm in 2005 and 2006. (Bowden Decl. at ¶ 26.) But Plaintiffs have offered no evidence, other than their own speculation, that this server was destroyed in a deliberate effort to hide evidence that would have been favorable to Plaintiffs' claims. Defendant contends that, before destroying the server, it "migrated" all of the information contained therein–including all relevant call records–to a new server computer. (Def. Resp to Pl.'s Add'l Facts ¶ 28.) Plaintiffs have apparently never inspected this new server, but they nevertheless contend that the migration destroyed electronic metadata that would have helped them prove their claims. (Pl.'s Resp. ¶ ¶ 26, 27; Christensen Decl. at ¶ 11-12) Kirkland asserts that it did not knowingly alter or destroy any metadata when it moved its information to a new server, and Plaintiffs have failed to call this assertion into question. There are many legitimate reasons why a large law firm might move its digital information and dispense with an old computer server, and Plaintiffs have not established,

13

nor even clearly alleged, that Kirkland's actions were motivated by a desire to conceal unfavorable evidence from the court.

Plaintiffs themselves have also innocently lost a potentially important piece of evidence in this case: the Nokia 6010 GSM digital cell phone that Bowden used throughout the alleged interception period. Bowden stated that she inadvertently lost her cell phone when it slipped from her pocket prior to the commencement of this litigation. (Bowden Dep. 330-31.) As a result, the cell phone is unavailable to be inspected for signs of tampering or whatever other evidence it might have contained. Neither Defendant nor the court has ever questioned Bowden's innocent explanation for the non-production of the cell phone; the loss or destruction of evidence does not necessarily support a *per se* inference of a party's bad faith or malfeasance. *See, e.g., Mathis v. John Morden Buick, Inc.*, 136 F.3d 1153, 1155-56 (7th Cir. 1998). Plaintiffs have not provided the court with any reason to doubt Defendant's benign explanation here. For this reason, the court declines to infer from the absence of the metadata that such evidence would have been favorable to Plaintiffs' claims.

## II.     Plaintiffs' Failure of Proof

A plaintiff may establish a violation of the ECPA by, *inter alia*, showing that the defendant (1) intentionally intercepted or endeavored to intercept any wire, oral, or electronic communication; (2) intentionally used or endeavored to use any electronic, mechanical, or other device to intercept any oral communication; (3) intentionally disclosed or endeavored to disclose to any other person the contents of any wire, oral, or electronic communication with knowledge or reason to know that the information was obtained through interception; or (4) intentionally used or attempted to use the contents of any wire, oral, or electronic communication with knowledge or reason to know that the information was obtained through interception. 18 U.S.C. § 2511. Section 2520 of the ECPA provides for a private right of action against one who intentionally violates the Act by intercepting,

using, or disclosing communications. 18 U.S.C. § 2050. Similarly, to establish a claim under the Illinois Eavesdropping Act, a plaintiff must show that the defendant (1) "knowingly and intentionally use[d] an eavesdropping device for the purpose of hearing or recording all or any part of any conversation or intercept[ed], retain[ed], or transcribe[d] electronic communication;" (2) manufactured, assembled, distributed, or possessed an electronic, mechanical, eavesdropping, or other device with knowledge or reason to know that the device was primarily useful for eavesdropping; or (3) used or divulged any information which he knew or reasonably should have known was obtained through use of an eavesdropping device. 720 ILCS 5/14-2. Thus, to prevail on either their federal or state eavesdropping claims, Plaintiffs must at least present some evidence that Kirkland knowingly and intentionally possessed an eavesdropping device and/or endeavored to intercept Plaintiffs' communications.

Plaintiffs have presented no such evidence here, and what little evidence is in the record is insufficient to support a reasonable inference that the alleged interception actually took place. Several of Defendant's witnesses testified unequivocally that Kirkland was incapable of engaging in the behavior that Plaintiffs alleged. In the face of this testimony, Plaintiffs have failed to produce evidence that establishes a material dispute on this allegation. Plaintiffs acknowledge that they have no personal knowledge of how Kirkland allegedly intercepted their calls. (Pl.'s 56.1 Resp. at ¶ ¶ 24, 26, 28, 38, 39, 40.) They never saw or heard of anyone at Kirkland actually using an eavesdropping device. They do not know who at Kirkland allegedly intercepted their calls, and they posit neither theory nor evidence to explain why or how Kirkland targeted their calls for surveillance. They have produced no tapes or records that any calls were monitored.

Instead, all that Plaintiffs have produced are records of what they believe are telephone billing and routing anomalies and a single e-mail that, in Plaintiffs's estimation, shows that Tilton, a non-Kirkland employee, mysteriously had knowledge of a private conversation between

15

Plaintiffs.[10] Even assuming the truth of all of this evidence, however, it could not lead a reasonable trier of fact to infer that Defendant could or did eavesdrop on Plaintiffs' calls. Plaintiffs' own expert testified that his analysis of the evidence, at best, "indicate[s] the *potential* for interception *may* have occurred." The theoretical possibility of interception, however, does not raise a genuine material dispute on the issue of whether Kirkland did in fact intercept Plaintiffs' calls. Plaintiffs must do more than raise a metaphysical doubt as to the material facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

It is undisputed that the kind of eavesdropping Plaintiffs allege requires highly sophisticated and expensive equipment that is not typically available to the public, and there is no evidence that Kirkland could or did obtain such equipment. Plaintiffs provide little more than conclusory speculation in support of their claims that this occurred. For example, they speculate that Kirkland may have illegally obtained eavesdropping devices from overseas suppliers. They conjecture, without evidence, that Graller or Quinlisk, in spite of their denials, were somehow involved in the eavesdropping. They further speculate, again without corroborative evidence, that the suspicious rerouting of calls to Gagen's home by AT&T demonstrates that Kirkland may have been in league with that telecommunications company; this provides a convenient reason for Plaintiffs to dismiss

---

[10] Of course, one possible explanation for Tilton's knowledge is that Gagen did tell Tilton (or, at least, told Tilton enough to allow her to infer) the information contained in the e-mail. Another possible explanation is that some unidentified co-worker was able to overhear Plaintiffs' conversations and somehow relayed this information to Tilton. Plaintiffs suggest that this is unlikely because, although Bowden shared her workspace with others at Kirkland, she deliberately lowered her voice and coded her conversations to ensure that her co-workers could not understand her private conversations. (Pl.'s 56.1 Stat. at 10.) The court will presume that Bowden adequately ensured the privacy of her conversation and that Gagen did not repeat the contents of her private conversations to Tilton. Even so, the fact that Tilton, an employee of Vedder Price, may have learned of Gagen's conversation through some unexplained means does not, without more, establish that Kirkland or its agents were knowingly and intentionally engaged in eavesdropping on Plaintiffs' conversations. The logical leap required for such a conclusion goes far beyond the type of reasonable inference that the court is required to draw in Plaintiffs' favor at this stage. Summary judgment "does not require [a] court to stretch existing evidence to reach conclusions or bolster arguments it could not otherwise support." *Frost Nat. Bank. v. Midwest Autohaus, Inc.*, 241 F.3d 862, 868 (7th Cir. 2001).

the independent investigations of Cingular Wireless and AT&T, which unearthed no evidence of interception.  Plaintiffs' bare assertions, however, supported by neither evidentiary support nor a foundation in Plaintiffs' first-hand knowledge or observation, are insufficient to generate a genuine factual dispute.  *See Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010) (the court's favor toward the non-moving party on summary judgment "does not extend to drawing inferences that are supported only by speculation and conjecture.") (internal quotation marks omitted).

After a substantial investigation and discovery process, Plaintiffs remain unable to generate any evidence to support their sweeping allegations beyond a few anomalous but inconclusive records and Tilton's purportedly unexplained familiarity with one of Gagen's statements.  This is simply not enough to sustain Plaintiffs' claims at this juncture.  Because Plaintiffs have not presented sufficient evidence to support their contention that Kirkland did, in fact, knowingly and intentionally intercept their private telephone calls, Kirkland is entitled to summary judgment on these claims.  *See Lombardi v. Range*, No. 01 C 6444, 2003 WL 21800071, *6 (N.D.Ill. July 23, 2003) (summary judgment on Illinois Eavesdropping Act claim was appropriate where the plaintiff failed to present sufficient evidence that wiretapping actually occurred or that defendants were the guilty party).  The ECPA and Illinois Eavesdropping Act claims are dismissed.

## CONCLUSION

Defendant's motion [209] is granted.

ENTER:

Dated: September 2, 2010

REBECCA R. PALLMEYER
United States District Judge