# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| TAMMI P. BOWDEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 07 C 975 |
| | ) | |
| KIRKLAND & ELLIS LLP, | ) | Judge Rebecca R. Pallmeyer |
| | ) | |
| Defendant, | ) | |
| ——————————————— | ) | |
| | ) | |
| NANCY J. GAGEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 07 C 979 |
| | ) | |
| KIRKLAND & ELLIS LLP, | ) | Judge Rebecca R. Pallmeyer |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Tammi Bowden and Nancy Gagen are both former employees of Chicago-area law firm Kirkland & Ellis LLP ("Kirkland"). Bowden, who is African-American, claims that the firm subjected her to a hostile work environment and discriminated against her on the basis of her race in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C § 2000e et eq., and 42 U.S.C. § 1981 ("Section 1981"). Specifically, Bowden asserts that her two direct supervisors gave her less favorable work assignments and subjected her to greater scrutiny than they applied to Bowden's Caucasian colleagues. When Bowden complained internally and filed a charge against the firm with the Equal Employment Opportunity Commission ("EEOC"), she asserts, her supervisors and co-workers retaliated by harassing her. Gagen, who is Caucasian, is Bowden's friend and co-worker. She advised and encouraged Bowden to file an EEOC charge. In her complaint, Gagen asserts that Kirkland unlawfully terminated her in retaliation for providing assistance to Bowden. Kirkland moves for summary judgment against both Plaintiffs.

As explained below, the court concludes that the specific acts of which Plaintiff Bowden complains do not support her race discrimination claim because they do not constitute materially adverse employment actions; they do not support a claim of retaliation because they would not have discouraged a reasonable person from filing a charge, and, notably, did not discourage Bowden herself. Plaintiff Gagen has failed to demonstrate a causal relationship between her activities and any adverse employment action taken against her. The court concludes that neither Plaintiff has adequately established the necessary elements of a claim for discrimination. Kirkland's motions for summary judgment are therefore granted as to both Bowden and Gagen.[1]

## BACKGROUND

Plaintiffs Bowden and Gagen assert their claims against Kirkland in separate cases, which are both before the court at this time. Because Plaintiffs' distinct employment claims rely on some overlapping facts, however, the court addresses them in a single opinion. In doing so, the court notes that Plaintiff Bowden, who appears *pro se*, has failed to respond to Defendant's motion for summary judgment or to its statement of undisputed material facts. Pursuant to Local Rule 56.1, a litigant seeking to oppose a motion for summary judgment must file a response to the movant's statement of facts and set forth any additional facts that require the denial of summary judgment. LR 56.1(b); *Chichon v. Exelon Generation Co. LLC*, 401 F.3d 803, 809 (7th Cir. 2005). Because Bowden has failed to abide by this rule, the facts set forth in Defendant's 56.1 Statement are deemed admitted by Bowden. The court relies on those facts and on its independent review of the

---

[1] Bowden, Gagen, and their mutual friend Faye Grey have also asserted claims against Kirkland based on the firm's alleged surveillance of their private telephone calls. Plaintiffs' eavesdropping claims were consolidated by this court on December 3, 2009, and Kirkland has moved separately for summary judgment on those claims. The court addresses that motion in a companion opinion issued contemporaneously with this one. To summarize the court's conclusions: Plaintiffs have failed to put forth any non-speculative evidence that Kirkland engaged in the alleged eavesdropping activities. Thus, to the extent that Plaintiffs' employment claims rely on or are intertwined with their allegations of illegal wire-trapping, their claims succumb to the same failure of proof.

record in analyzing Bowden's claims.  Plaintiff Gagen has fully complied with the local rules.

Bowden's factual admissions, therefore, do not prejudice or impact the court's analysis of Gagen's

separate claim.  The court recounts all of the facts in the light most favorable to Plaintiffs, as the

non-movants.

## I.    Bowden's Employment History[2]

Plaintiff Bowden began working as a legal secretary for Kirkland in December 1996.  (Def.

56.1 Stat. at ¶ 2.)    As a legal secretary, Bowden's work was supervised by various Kirkland

attorneys and by Donna Amos, Kirkland's Secretarial Services Manager.  (*Id.* at ¶ 9; Bowden Dep.

26-29.)  In 2004, the firm created a new position called a Floor Practice Support Specialist ("FPSS")

to provide technical assistance to Kirkland's attorneys and staff during the firm's transition from

Word Perfect to Microsoft Word computer software.  (Def. 56.1 Stat. at ¶ 10.)  Bowden applied for

the position, passed the required skills tests, and was selected over another internal applicant to

"pilot" the FPSS program.  (*Id.* at ¶ 11; Bowden Dep. at 30-32.)  In the FPSS position, as Bowden

understood it, she was to report directly to Amos rather than to any specific attorney.  (Bowden Dep.

at 32-34.)  Bowden began working as an FPSS and reporting exclusively to Amos in September

2004.  (Def. 56.1 Stat. at ¶ 12.)  In 2005, when Kirkland decided to extend the FPSS program and

make it permanent, Amos altered the chain of command so that Bowden reported to Leigh Quinlisk,

Kirkland's Document Services Coordinator.  (*Id.*)   Amos remained Quinlisk's direct manager.

Though Bowden admitted that she initially sought the FPSS job of her own accord, she now

believes her selection for the position was "the beginning of a plan [by Amos and Quinlisk] to

probably get me fired ultimately at Kirkland."  (*Id.* at 111.)   Bowden bases her belief, in part, on

Amos's decision to place Quinlisk in a supervisory role over Bowden.  "I wasn't Donna [Amos] 's

favorite," Bowden testified.  "Leigh [Quinlisk] was the hatchet woman for Donna."  (*Id.*)

---

[2]    The record citation in this portion of the order refers to those materials submitted in connection with Defendant's motion for summary judgment in Bowden's case (No. 07 C 975).

Both Quinlisk and Amos are Caucasian. Bowden testified that she suspects Amos has a "race problem" because Amos's sister-in-law once told Bowden that Amos's family harbored racial prejudices. (Bowden Dep. at 101-05.)[3] According to Bowden, the sister-in-law stated that she had overheard Amos's brother use racial epithets. (*Id.* at 104.) Bowden admitted that she has never heard that Donna Amos herself made any racist comments, and speculates that Amos shares her family members' views but "learned that it wasn't politically correct [to make overtly racist remarks]." (*Id.* at 106.) Bowden also believes that Amos and Quinlisk used Bowden as a pawn to ensure the success of the FPSS program: "I believe they had a plan for me from beginning to end," Bowden testified. "They couldn't avoid putting me in the pilot. Hands down I was the choice. I had the familiarity with the lawyers . . . . I had the relationship with the lawyers, the camaraderie . . . They had confidence in my work . . . [Amos and Quinlisk] could use me, and [believed I would] make [the FPSS program] succeed, and I did." (Bowden Dep. at 117.)

## A.   Bowden Accuses Quinlisk of Discrimination

The central dispute culminating in Bowden's discrimination claim arose in 2005, when Amos assigned Quinlisk the task of coordinating the preparation of a "Best Practices Guide" (the "Guide") for the Document Services Department. The Guide was intended to contain sample documents from each of the firm's practice areas. Legal secretaries from each area were asked to submit sample documents, which the Document Services staff then reviewed for proper formatting and style and selected for use in the Guide. (Def. 56.1 Stat. at ¶ 13.) Quinlisk initially chose Christine Rampich, a Caucasian FPSS with less experience than Bowden, to assist in compiling the Guide. (Id. at ¶ 14; Quinlisk Dep. at. 471.) Quinlisk testified that the reason she asked Rampich to assist

---

[3]     Bowden testified that she works with Amos's sister-in-law in her current job at the law firm of Marshall, Gerstein, & Borun LLP. Apparently the sister-in-law has, on occasion, discussed the racial attitudes of Amos's family with Bowden. The sister-in-law's statements are not admissible for their truth, but are presented to give the reader some context as to the basis for Bowden's beliefs.

with the project was that Rampich worked over the weekends, when the pace of regular work was slow and there was more time to devote exclusively to the Guide. (*Id.* at 460-61.) Bowden suspects, however, that Rampich was given the favorable assignment because of her race. "[Rampich] was in on the assignment early on," Bowden testified. "I would have liked to have participated in it. I had been at the firm much longer than anyone in the department. . . . I was not involved in it until it had reached the final stages of the work and it was the mop-the-floors-and-clean-up-after-the-party work." (Bowden Dep. at 171.) In any event, there is no evidence that Rampich or any other employee who worked on the Guide received additional compensation or promotional opportunities as a result of their work. (Def. 56.1 Stat. at ¶ 17; Bowden Dep. at 184.)

In June 2004, after a substantial portion of work on the Guide was already done, Quinlisk sent an e-mail to Bowden and the other members of the department to solicit assistance in completing the Guide. (Quinlisk Dep. at 464.) Bowden agreed to select and format a few documents for the Guide's litigation section. (Bowden Dep. at 136.) On August 15, 2005, Quinlisk sent Bowden an e-mail, updating Bowden on the status of the project and asking Bowden to format one remaining document. (Bowden Dep. at 141; Ex. 23 to Bowden's Dep.) Quinlisk's e-mail also contains the following paragraph, as an aside, near the end of the message: "Just so you know, the brief you selected with the TOA [table of authorities] was horrible. We found out that the version you had was not the one actually filed, but even the one that was filed was riddled with errors. They have been fixed and the document is now in good shape." (*Id.*) Bowden responded a few minutes later, saying: "Leigh, if you want to look at my 7/27/05 e-mail to you, you will see that the only brief I indicated was completed was the one including the points and authorities. The others either I had not found exemplars for or had found them but indicated they needed to be cleaned up . . . I selected the brief with the 'TOA' because it was exemplar; that is, [it] was a brief that contained a table of authorities." (*Id.*) Quinlisk wrote back to Bowden later the same day, stating: "I fully understand what your e[-]mail indicated. I was just letting you know that it was in horrible shape.

I was under the impression that you found documents that were good examples and just needed some formatting." (*Id.*) Bowden again wrote back to Quinlisk and attempted to explain why, in her view, Quinlisk had misunderstood her earlier e-mail. Quinlisk appears to have accepted Bowden's explanation: "Not a problem," Quinlisk wrote in reply. "I see what you are saying about the Appellate Brief for Federal court . . . most of the documents were in pretty good shape, just needed some minor fixes. Not a big deal. . . ." (*Id.*)

Notwithstanding Quinlisk's assurances that the issue was "not a big deal," Bowden continued to express indignation over the next few days at what she perceived as unfair criticism of her work. On August 25, 2005, Bowden wrote another e-mail to Quinlisk, stating:

> Below is my 7/27/05 e-mail to you . . . which I had *occasion to review today* . . . <u>Note bene</u>, with respect to all itemized exemplars . . . that I stated: "all [were] *badly* in need of 'best practices' reformatting, by my cursory review." (Emphasis added)

> Therefore, your recent criticism of my *choice* of those exemplars because their formatting was "horrible" was unwarranted and unfair to say the least. [4]

(Bowden Dep. 141-44, Ex. 24 to Bowden Dep.) Quinlisk responded by e-mail, writing, in part: "The reality is that some of the documents that you chose for the samples were in horrible condition and I conveyed that to you. It was not a criticism, it was an update to let you know where the documents stood. I'd be happy to discuss further upon my return." (*Id.*) At the time, Quinlisk was away from the office on vacation. (Def. 56.1 Stat. at ¶ 21.)

Bowden refused to let the matter drop. On September 3, 2005, Bowden sent another e-mail to Quinlisk, stating: "Leigh, we're apparently going in circles because the documented facts are being misapprehended, overlooked, or simply ignored . . . I'll rest with the record." (Ex. 25 to Bowden's Dep.) On September 4, 2005, Quinlisk attempted to defuse the matter, explaining, "I was not criticizing your work, I was giving you a status . . . I do not understand why this is an issue. I

---

[4]       The court has produced the e-mail excerpt as it appears in the record. All emphasis and the parenthetical phrase "(Emphasis added)" itself appear in original e-mail from Bowden.

know that if I selected some documents and they did not turn out to be great documents, I would want to know. I would like to talk to you about this when I get back from vacation on the 12th." (Ex. 26 to Bowden Dep.) Quinlisk sent a copy of her September 4 e-mail to Donna Amos, an act Bowden believes was an attempt to intimidate or discipline her. (Bowden Dep. at ¶ 168.)

The day before, however, on September 3, 2005, Bowden had herself forwarded a copy of the testy e-mail exchange to Kirkland's Human Resources Manager Cheryl Bane with the following message: "Cheryl, I really feel I'm being harassed by Leigh Quinlisk. She certainly has a disparate approach to her handling of people in her department . . . . I don't believe she's fair, and she appears to be uncomfortable dealing with African-Americans . . . . This latest communication from Leigh proves that she is incapable of objectivity in her dealings with me." (Ex. 29 to Bowden Dep.) At her deposition, Bowden testified that she believed Quinlisk's criticism was racially motivated because Quinlisk did not similarly criticize Rampich or other Caucasian employees for their work on the Guide. (Bowden Dep at 179.) "[Rampich] never was written up for selecting bad documents, for having the index wrong, or for anything to do with Best Practices," Bowden testified. (Bowden Dep. at 168.) Bowden admitted, however, that she did not know whether Quinlisk ever spoke to Rampich about any mistakes that Rampich may have made while working on the Guide. (Bowden Dep. at 177-78.)

On September 5, 2005, Bowden wrote yet another e-mail to Quinlisk, this time informing Quinlisk that the matter had been referred to Bane. (Ex. 3 to Deposition of Wendy Cartland, Kirkland's firm-wide HR Director.) Bowden sent copies of this e-mail to Bane and several senior administrators and attorneys, including members of Kirkland's executive committee. (*Id.*) The e-mail from Bowden reads: "Leigh, I'm not going to argue with you. I see where you're going with this. If you're going to set me up, you'll have to do it in public." (*Id.*) It goes on to list several former African-American employees of Kirkland who, Bowden asserted, had been victims of discrimination at Quinlisk's hands. In the e-mail, Bowden accused Quinlisk of treating her African-American

subordinates "coldly and otherwise differently while overlooking blatant problems" with Caucasian subordinates. (*Id.*) Bowden further claimed that Quinlisk's "horrible" comment was made in retaliation for Bowden's (1) complaining that two Caucasian employees took excessive breaks to smoke cigarettes, (2) complaining about delays in receiving Bowden's FPSS skills test results, (3) complaining that the FPSS skills test scoring was unfair, and (4) refusing to "pilot" a particular kind of software that Quinlisk had requested. "I will not be your next victim," Bowden concluded. "Worrying about what your next attack will be creates unnecessary stress for me at work and has affected my ability to sleep at night." (*Id.*)

Following the receipt of Bowden's e-mail, Kirkland's Human Resources staff began an investigation into her allegations. (Def. 56.1 Stat. at ¶ 28.) The HR staff reviewed personnel files for all current and former employees who had reported to Quinlisk, checked the termination and resignation records for departing Document Services and Secretarial staff, and independently evaluated the FPSS testing instruments that were the focus of Bowden's complaints. (*Id.* at ¶ 29.) Kirkland's HR staff also interviewed Bowden, Amos, Quinlisk, Staff Recruiting Manager Mary McMahon, and Staff Recruiter Deb Johanson. (*Id.* at ¶ 30.) On September 21, 2005, Kirkland's Chief Human Resources Officer Gary Beu met with Bowden for more than two hours to discuss her complaint. (Bowden Dep. at 266; Beu Dep. at 89-90.)

Beu testified that he felt that the e-mail exchange that had served as the catalyst for Bowden's complaint had been "a serious misunderstanding . . . particularly as it related to the development of this best practices guide and a selection of certain examples." (Beu Dep. at 92.) In Beu's estimation, there was some "misinterpretation of what was intended by the use of the word or reference to these exemplars being in horrible condition. And that it seemed to me that Ms. Bowden took considerable offense at what she perceived to be a criticism [of her work]." (*Id.* at 94.) Beu concluded that it would be beneficial for Bowden and Quinlisk to meet face-to-face to "talk through this issue regarding the best practices guide." (*Id.* at 93.) Beu suggested the meeting to

Bowden, and Bowden indicated that she would be open to the possibility. (*Id.* at 103-04.) Beu advised Quinlisk that Bowden was willing to meet with her, and Quinlisk contacted Bowden to request a meeting. (Beu Dep. at 124-25; Bowden Dep. at 147-48.) Bowden did initially agree to the meeting, but later backed out and refused to speak with Quinlisk. "I felt that I would get in trouble," Bowden testified, "that something would be mischaracterized, and I didn't think it wise." (Bowden Dep. at 148.) In light of the continuing discord between the two women, Kirkland offered to transfer Bowden into a legal secretary position, in which she would no longer report to Quinlisk. According to Kirkland's firm-wide HR Director, Wendy Cartland, the proposed transfer would not have resulted in a change in Bowden's compensation or employment status. (Cartland Dep. at 135-36.) Bowden declined the offer, however, and remained in the FPSS position reporting to Quinlisk.

## B.    Bowden Receives a "Final Warning"

During summer 2005, Bowden volunteered to assist with an out-of-town trial at the request of several attorneys. (Bowden Dep at 124-25.) The trial was in Denver, Colorado, and was scheduled to last several months. (Def.'s 56.1 Stat at ¶ 43.) Dan Rooney, a Litigation Assistant on the trial team, e-mailed Amos in late August to say that the senior attorneys on the case had specifically requested Bowden's assistance and sought approval for Bowden to travel to Denver for the duration of the trial. (Ex. 15. To Bowden Dep.) On September 7, 2005, Amos wrote to Rooney, stating, "I don't foresee a problem with Tammi assisting." (*Id.*) Bowden reiterated her willingness to assist at the trial, and on September 21, 2005, Amos gave Bowden final approval to travel for the assignment. (Def.'s 56.1 Stat at ¶ 43; Ex. 16 to Bowden Dep.)

The next day, four days before the trial team was set to depart for Denver, Bowden sent Rooney an e-mail advising him that "due to an unexpected and unresolved employment matter, I feel that it is in my best interest to remain behind until it is concluded. Sorry that this affects the team." (Bowden Dep. At 130; Ex. 17 to Bowden Dep.) Rooney responded with surprise and consternation: "Please let me know ASAP when I could expect you to come out. I have no idea

what your situation is but I can't have anything negatively impact what we are trying to do for the client." (*Id.*) Bowden then withdrew entirely from her commitment to travel for the trial. The "employment matter" to which Bowden was referring is apparently her complaint against Quinlisk, and her decision to withdraw from the trial team was unilateral. Bowden admitted that she did not seek advance approval from any supervisor or manager before announcing her withdrawal. (Bowden Dep. at 130-131.) According to Bowden, her offer to assist the trial constituted "a voluntary assignment" that was outside of her regular job duties. (*Id.*) Thus, Bowden reasoned, no approval was necessary before she withdrew her offer of help. (*Id.*) Cartland and Beu confirmed that traveling to support cases is indeed voluntary under Kirkland's policies for support staff. (Beu Dep. at 153-54; Cartland Dep. at 213.) Both Cartland and Beu testified, however, that once a staff member volunteers to travel and to assume trial support responsibilities, such an offer becomes a binding commitment, which employees are expected to fulfill as they would any other assignment. (Beu Dep. at 154; Cartland Dep. at 213.)

On September 27, 2005, Cartland and Bane issued Bowden a "Final Warning" letter, citing Bowden's "insubordinate refusal to accept a delegated assignment–including [her] unilateral decision not to support a trial team in an out-of-town case" and her "unjustified refusal to discuss on-going work matters with [her] supervisor." (Def. 56.1 Stat. at ¶ 50; Cartland Dep. at 208; Ex 11 to Cartland Dep.) The "refusal to discuss" language is apparently a reference to Bowden's refusal to meet with Quinlisk to resolve the lingering issues regarding the Best Practices Guide. The warning letter further stated that Bowden's actions were "insolent and counter-productive and [would] not be tolerated" and informed Bowden that she risked "further discipline up to and including termination" if she failed to follow her supervisor's directions and firm policies in the future. (Ex. 11 to Cartland Dep.) Bowden admits that she did not suffer any changes to her compensation, title, or job function as a result of the final warning. (Bowden Dep. at 153.) She testified that she received salary increases and merit bonuses as scheduled for both 2005 and 2006, and she also

earned the highest-possible mark on her internal job performance rating: "outstanding." (Bowden Dep. at 151-53.)  In Bowden's employee evaluation for the period of October 2004 to September 2005, Quinlisk herself wrote, "[t]he quality of Tammi's work product can only be described as exceptional. . . ."  (Ex. 28 to Bowden Dep.)  Quinlisk observed, however, that "Tammi needs to accept constructive criticism in the manner in which it is intended (as a catalyst for development) and not personalize it . . . .  During this review period, Tammi and I have struggled with communication between us."  (*Id.*)  The copy of the evaluation in the record is undated.

On October 6, 2005, Cartland sent an internal memorandum to Beu, reporting the results of Kirkland's investigation into Bowden's discrimination complaint.  (Cartland Dep. at 134; Ex. 7 to Cartland Dep.)  According to the report, the firm found no evidence that Quinlisk was "less than fair or professional" with her subordinates and "that there [was] no evidence of unfair treatment or harassment."  (*Id.*)  Beu discussed these conclusions with Bowden on October 14, 2005.  Bowden believes that Kirkland's investigation into her allegations was inadequate because the firm's HR staff did not interview other African-American employees who worked under Amos and Quinlisk. (Bowden Dep. at 268.)

### C.    Bowden is Treated "Coldly" at Work

Bowden speculates that, after September 2005, she lost out on desirable work assignments and other opportunities as a result of continued discrimination and in retaliation for her internal complaint.  (Bowden Dep. at 153.)  For example, she claims that she was not given the same opportunities as Caucasian employees to perform hiring or recruiting functions (such as administering the FPSS test), to conduct internal training sessions, or to serve as "acting-supervisor" on days when Quinlisk was out of the office.[5]  Bowden also claims that she was not

---

[5]    In addition, Bowden contends that Kirkland's failure to hire her friend Faye Grey, who is also African-American, was an act of discrimination.  Grey has advanced her own discrimination claim, which the court addresses in a separate order.  As the court explains in that order, Grey
(continued...)

given the opportunity to attend outside training on Power Point, Excel, Microsoft Office, and other software.[6] Bowden speculates that Caucasian employees were given preference in these areas. As support for this speculation, she notes that Caucasian employees frequently met with Quinlisk privately in her office and appeared to enjoy good personal relationships with Quinlisk. (*Id.* at 202-04.) Bowden admits, however, that she does not know what Quinlisk and other employees discussed at such meetings. (Bowden Dep. at 218.) She also admits that Quinlisk never refused to meet privately with her. (*Id.*) Bowden admits, further, that she never asked anyone for the opportunities that she now claims she was denied. (*Id.* at 202-04; 254-55.) She does not know whether other employees made such requests, nor is she aware whether any of the opportunities she claims to have been denied resulted in additional compensation or promotion opportunities. (Bowden Dep. at 200-02.) Bowden also complains that she was given unduly large work assignments, but she admits that the she voluntarily assumed these substantial projects and that she was given assistance from other members of her department when she requested it. (Def. 56.1 Stat. at ¶ 72; Bowden Dep. at 223-29.)

Finally, Bowden asserts that, beginning in October 2005, her Caucasian co-workers were "unfriendly" and "nasty" to her, but she was unable to describe specific statements or incidents because the mistreatment was "subtle." (Bowden Dep. at 232.) At least one African-American co-worker was also "kind of cold" to Bowden. (*Id.*) When asked whether this cold treatment affected her ability to perform in her job, Bowden testified: "I worked at a high level so I was able still to

---

[5](...continued)
failed a standard screening test for the position that she sought. Bowden admits that she has no special insight into Kirkland's hiring decisions and no knowledge as to why Kirkland might have hired other applicants in lieu of Grey. (Bowden Dep at 214-16.) The court concludes that Kirkland's failure to hire Grey does not bolster Bowden's claims.

[6]      There is no indication in the record when any of these training sessions or other hypothetical opportunities actually occurred.

perform, but was I at the top of my game so to speak–no." (*Id.* at 237.) Bowden further testified that she was never the subject of any threats or racial slurs. (*Id.* at 278.)

**D.     Bowden Quits her Job**

On October 5, 2005, Bowden filed a charge of race discrimination against Kirkland with the Equal Employment Opportunity Commission ("EEOC"). On November 20, 2006, the EEOC completed its investigation and reported that it was "unable to conclude that the information obtained [by the commission] establishe[d] violations of the statutes." (EEOC Letter, Ex. 2 to Compl.) Bowden remained employed at Kirkland until February 2007. During that time, she never complained internally of harassment or discrimination because, she testified, she did not "feel welcome" to file further complaints. (Bowden Dep. at 277.) On February 16, 2007, Bowden sent the firm a letter asserting that she believed she had been constructively discharged and stating that she would no longer be reporting to work at the firm. (Bowden Dep. 296-98.) As the immediate reason for her resignation, Bowden cited her belief that the firm was secretly eavesdropping on her private telephone calls. "I just couldn't take walking in the place any longer," Bowden testified. "My cell phone had been intercepted. They had committed a crime against me. I wasn't going to wait for them to ratchet that crime up." (*Id.* at 298.) It is undisputed that no Kirkland manager ever told Bowden that she was terminated. (*Id.* at 297.) Nor did Bowden receive any formal reprimands or discipline between the 2005 final warning and her resignation. (Def. 56.1 Stat. at 61.)

At the time that she sent the February 2007 letter ending her employment, Bowden had been on intermittent leave–usually for a few days or a week at a time–for approximately six weeks to help care for her father. (Def.'s 56.1 Stat. at ¶ 63; Bowden Dep. at 422-24; Amos Dep. at 525.) Bowden admitted that she began seeking other employment in December 2006, about two months before she actually left Kirkland. (Bowden Dep. at 401-02, 408-10; Ex. 34 to Bowden Dep. at 11-12.) She received an offer of employment from her current employer, the Chicago law firm of Marshall, Gerstein, & Borun LLP, in either January or February 2006, just prior to informing Kirkland

that she no longer intended to report for work. (Bowden Dep. at 24-25.) Bowden filed this lawsuit on February 20, 2007.

## II.     Gagen's Employment History[7]

Plaintiff Nancy Gagen was a Technical Document Specialist at Kirkland from March 2002 until March 2006. (Pl.'s 56.1 Resp. at ¶ 2.) In that position, Gagen reported to Amos and Quinlisk. (*Id.* at ¶ 13.) Bowden's mass e-mail of September 5, 2005–which accused Quinlisk of race discrimination--also mentioned Gagen as one of several employees whom Quinlisk had supposedly harassed:

> You apparently have a problem with older workers whom you have not personally hired/recruited. Hence Carol Johnson . . . suffered under you and so has Nancy Gagen . . . . You've attempted to alter your rude manner of speaking to others, but I know in the past and in your early dealings with Nancy Gagen that you've insulted her on a number of occasions, only to have to apologize later.

(Ex. 3 to Cartland Dep.) Despite Bowden's mention of Gagen in the complaint e-mail, Gagen was never subsequently interviewed by anyone in Kirkland's HR Department. (Gagen Decl. at ¶ 5.)

Gagen, who is Caucasian, contends that she encouraged Bowden to send the mass e-mail and to file her subsequent EEOC charge. According to Gagen, Bowden "did not know where to go and how to report within the Kirkland environment" so Gagen "helped" her. (*Id.* at ¶ 16-17.) The help Gagen provided involved urging Bowden to contact a lawyer, encouraging Bowden to file the EEOC charge, and agreeing with Bowden in private conversations that "African-American employees did not fare well with Quinlisk." (Pl.'s 56.1 Resp. at ¶ 30; Gagen Dep. at 129-32, 139-40.) The EEOC charge itself does not mention Gagen; the charge lists no witnesses or comparable employees, and Gagen never informed Kirkland that she was involved in Bowden's complaint. (Pl.'s 56.1 Resp. at ¶ 27-29.) Thus, Cartland and Amos testified, no manager at Kirkland was ever aware that Gagen knew of or assisted Bowden's complaint or EEOC charge in any way. (Cartland

---

[7]     The record citation in this portion of the opinion refers to those materials submitted in connection with Defendant's motion for summary judgment in Gagen's case (No. 07 C 979).

Dep. 418-24; Amos Dep. 329-30.) Gagen challenges this testimony and insists that Kirkland was aware of her encouragement to Bowden because the firm secretly eavesdropped on her private telephone communications. For the reasons explained in the companion opinion issued today, however, there is no non-speculative evidence to support Gagen's conjecture that the firm eavesdropped on her phone calls.

## A. Gagen Reports Rampich

Beginning in summer 2005, Gagen asserts, she began being "hazed" by Rampich and a few other co-workers who Gagen perceived to be favorites of Quinlisk. (Gagen Dep. at 115.) Gagen described the "hazing" this way: "It was looks, smirks. [Rampich] would go into Quinlisk's office. They would talk. . . . They would look at you when you'd come in. You'd get out to walk to maybe go get a cup of coffee or something, and she'd look at you and smirk at Quinlisk and stare right back at you like, huh, I'm in on the in crowd, baby." (*Id.* at 115-16.) Rampich was a Technical Document Specialist with no supervisory responsibility or authority over Gagen, and Quinlisk testified that she did not encourage Rampich or anyone else to display a negative attitude toward Gagen. (Pl.'s 56.1 Resp. at ¶ ¶ 19, 42.) It does not appear that Rampich herself was deposed in connection with this matter.

On December 23, 2005, Gagen received a telephone call from her friend and co-worker Bonnie McDuffie, who told Gagen that she had overheard Rampich making derogatory comments about Gagen's work on a specific assignment. (Pl.'s Resp. at ¶ 17.) According to Gagen, she had been forced to leave her desk the previous evening to attend a meeting and had routed that particular assignment to another secretary. (Gagen Dep. 108-10.) Rampich was apparently deriding the fact that Gagen had not finished the job herself. Following this call from McDuffie, Gagen immediately sent an e-mail to Quinlisk and Bane reporting "the derogatory comments made by [Rampich] against my name." (Pl.'s Resp. at ¶ 18; Ex. 9 to Gagen Dep.) Though the e-mail does not identify any specific comment, it goes on to state: "I do not want Chris Rampich discussing

15

me in a derogatory manner in front of others. It is unprofessional. . . . The other concern I have with this situation is that you [Quinlisk] and [Rampich] do not have the normal supervisor's 'arm's length' relationship. . . . I am making a formal complaint about the working environment." (Ex. 9 to Gagen's Dep.) Quinlisk responded to Gagen by e-mail later that day, writing: "Thank you for bringing this to my attention. . . . This type of behavior by all involved is inappropriate." (Ex. 35 to Quinlisk Dep.) In reply, Gagen wrote: "I do think a hostile work environment has existed . . . Document Services has had many ups and downs with staffing[,] but [in the] past[,] staff members . . . were always respectful and cordial to each other. Chris Rampich and [other employees] have exhibited a distinct negative bias against Bonnie McDuffie and myself." (*Id.*) Gagen then went on to describe several incidents of what she deemed Rampich's lack of professionalism.

In response to Gagen's complaints, Bane called a department meeting in January 2006, at which she emphasized the need for everyone involved to work together as a team. (Pl.'s Resp. at ¶ 21.) Quinlisk, Rampich, Gagen, and several other Kirkland staff members attended this meeting. Bane also asked the individuals present to identify one change that they most wished to see in their working conditions. Gagen testified that she responded to this question by suggesting that the firm hire a third shift of document specialists because she no longer wanted to work late into the night to complete assignments. (Gagen Dep. at 104-05.) At no time during this meeting did Gagen raise concerns about race discrimination or retaliation. (Pl.'s 56.1 Resp. at ¶ 22.) Gagen does not know whether any subsequent action was taken with respect to Quinlisk or Rampich following the meeting. (*Id.* at ¶ 23.) Gagen believes that Bane should have held a confidential meeting with her to further discuss her complaint, but there is no evidence that Gagen ever explicitly sought or requested such a meeting.

### B. Gagen Receives Onerous Work Assignments

Following the department meeting, Gagen claims, she began receiving "extraordinarily huge" work assignments from Quinlisk. (Pl.'s 56.1 Stat. at ¶ 49.) For example, on January 24,

2006, Gagen was assigned to convert 800 pages of a document from Word Perfect to Microsoft Word in the course of one evening, and Quinlisk failed to line up assistance for Gagen. (Gagen Dep. at 106.) Gagen admits, however, that after she requested help that evening from another supervisor, she was assigned two assistants and ultimately succeeded in completing the job in a timely fashion. (*Id.*) Though Gagen was occasionally required to stay late to finish large assignments, she was always compensated for her overtime work and she was never disciplined in any way for failing to complete an assignment. (Pl.'s Resp. at ¶ 51.)

### C.    Gagen is Dismissed for Disclosing Confidential Information

In March 2006, Quinlisk received an e-mail from former Kirkland employee Lynn Tilton, who was then working at the competing Chicago law firm of Vedder Price. The e-mail states that Tilton had received "an unusual phone call yesterday from Nancy Gagen." (Quinlisk Dep. 360-61; Ex. 30 to Quinlisk Dep.)[8]  In the ensuing e-mail exchange, Tilton reported that Gagen had told her that Kirkland was "clamping down" on its employees and that Quinlisk's shoddy work would no longer go unnoticed. (Quinlisk Dep. 361-62; Ex. 31 to Quinlisk Dep.) According to Tilton, Gagen also predicted that Amos "would soon be stripped of many responsibilities until she is no longer needed." (*Id.*) Gagen admits that she spoke with Tilton the day before Tilton sent the e-mail, but she denies ever conveying the specific information that Tilton recounts. (Gagen Dep. 212-13.) According to Gagen, it was Tilton who initiated the conversation about Quinlisk and Amos: "[Tilton] talked about how she felt hate directed towards her by Donna [Amos]. . . . I said that's just Donna. . . . I told her all the [rotating secretaries] didn't like Donna because Donna had a very harsh side to her." (*Id.* at 82-83.) Gagen denies that she ever told Tilton about any changes in Kirkland's policies or the specific criticisms that Tilton recounted. That information, Gagen testified, "was completely absolutely never discussed in any way, shape[,] or means with Lynn Tilton." (*Id.* at 213.) Gagen

---

[8]    The contents and circumstances of this exchange were recounted by Quinlisk. So far as the court is aware, Tilton herself was not deposed in connection with this lawsuit.

now believes that the Tilton e-mail was a setup, engineered by Quinlisk, to create a pretext for Gagen's termination. She speculates that the information Tilton wrote in the e-mail was relayed to her by someone else who had eavesdropped on Gagen's private telephone conversations with Bowden. Beyond Gagen's conjecture, however, there is no evidence that Quinlisk and Tilton conspired to frame Gagen or that anyone ever eavesdropped on Gagen's telephone calls.

After relaying Gagen's complaints about Amos and Quinlisk, Tilton's e-mail explained Tilton's reason for corresponding with Quinlisk: "I don't have anything against Nancy but cannot understand why she would want to communicate these types of issues to anyone especially someone outside the K&E firm. Having a number of years in management, I would hope that should someone take such actions against me, that somehow I be made aware." (Ex. 31 to Quinlisk Dep.) Quinlisk immediately forwarded Tilton's e-mail to Amos. Amos testified that she saw no reason to doubt the veracity of the e-mail and that she deemed termination to be an appropriate sanction for Gagen's discussing internal personnel matters and making derogatory remarks about her supervisors in a conversation with an employee at another law firm. (Amos. Dep. at 305, 318-21.) At Amos's behest, Kirkland fired Gagen on March 13, 2006, citing, as its reason, Gagen's disclosure of confidential information. (Def. 56.1 Stat. at ¶ 38.) At a meeting with Bane and Quinlisk present, Amos informed Gagen that her employment was terminated. (Pl.'s Resp. at ¶ 40.) Gagen responded by accusing Amos of firing her in retaliation for Bowden's EEOC charge. Bane and Amos told Gagen they did not know what she was talking about. (Pl.'s Resp. at ¶ 41; Amos Dep. 315-16.) Quinlisk said nothing.

On March 24, 2006, two weeks after her termination, Gagen filed her own charge with the EEOC, asserting that she was fired in retaliation for aiding Bowden (Pl.'s Resp. at ¶ 42.) In November 2006, the EEOC closed its investigation, stating that it was "unable to conclude" that the evidence in Gagen's case established an act of retaliation. (Pl.'s Resp. at ¶ 43.) Gagen filed her lawsuit against Kirkland on February 20, 2007.

## DISCUSSION

**I.     Legal Standard on Summary Judgment**

The primary purpose of summary judgment is to isolate and dispose of factually unsupported claims. *Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001). On summary judgment, the evidence of the non-movant is to be believed, and all justified inferences are to be drawn in her favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and the affidavits, if any, show that there is no genuine issue as to any material fact such that the movant is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c); *Celotex v. Catrett*, 477 U.S. 317, 322 (1986). In order to avoid summary judgment, the non-movant must come forward with specific facts showing a genuine issue for trial and produce sufficient evidence to permit a jury to return a verdict in her favor. *Argyropoulos v. City of Alton*, 539 F.3d 724, 732 (2008); *Karazanos v. Navistar Intern. Transp. Corp.*, 948 F.2d 332, 337 (1991) ("[A] plaintiff's speculation in not a sufficient defense to a summary judgment motion.") A mere scintilla of evidence in support of the non-movant is insufficient, as the evidence must create more than a metaphysical doubt as to the material facts. *Liberty Lobby*, 447 U.S. at 252; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

**II.     Bowden's Title VII and Section 1981 Claims**

As the court reads Bowden's complaint, Bowden claims that she was subject to a hostile work environment and discrimination on account of her race in violation of Title VII and Section 1981. She also claims that she was retaliated against for reporting these violations both internally and to the EEOC, culminating in what she describes as "constructive discharge" from Kirkland's employment. The court addresses each of Bowden's claims in turn.

**A.     Hostile Work Environment**

In order for her hostile work environment claim to survive summary judgment, Bowden must present evidence that she was harassed because of her race and that the complained-of harassment was "severe or pervasive enough to create an objectively hostile or abusive work environment." *Ford v. Minteq Shapes and Services, Inc.*, 587 F.3d 845, 847 (7th Cir. 2009) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). Whether Bowden's work environment was objectively hostile depends on several factors that may include the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with Bowden's work performance. *Harris*, 510 U.S. at 21. In order for the work environment "to amount to a change in the terms and conditions of employment," the circumstances "must be extreme." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). The standards for judging hostility are not intended to impose a "general civility code" upon employers; rather, they act to filter out complaints that merely allege "the ordinary tribulations of the workplace." *Id.* (quoting *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998); and B. Lindemann & D. Kadue, SEXUAL HARASSMENT IN EMPLOYMENT LAW 175 (1992)).

The conduct complained of by Bowden does not satisfy this high standard. Bowden admits that she was never subjected to racial slurs or physical threats. Her second-hand account that members of Amos's family (but not Amos herself) once made racially derogatory remarks (assuming it is admissible at all) has no bearing on her claims, and the handful of other unfair acts and critical statements that she attributes to Kirkland are all examples of "those petty slights or minor annoyances that often take place at work." *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). At most, Bowden claims that she was (1) occasionally given unfavorable work assignments in lieu of other projects/opportunities that she would have preferred, (2) unfairly criticized by her superiors, and (3) treated coldly by her co-workers. She herself testified, however,

that these actions did not prevent her from discharging her duties at a high level. As explained

below, the circumstances of which she complains are not sufficiently severe or pervasive to support

a hostile work environment claim.

First, the court addresses Bowden's assertion that she was given unfavorable and unduly

arduous work assignments and passed over for desirable duties, such as spearheading the Best

Practices Guide, administering training tests, and performing other hiring or training functions.

Bowden herself testified that she in fact requested the difficult assignments that she now complains

of, and the undisputed evidence is that Bowden was given assistance with time-consuming projects

when she requested it. She was never disciplined for any failure to complete her projects in a

timely fashion. Bowden also admits that she did not request those projects or assignments for

which she claims to have been passed over. Given these admissions, the only available inference

is that Bowden received those work assignments which she sought and did not receive those work

assignments which she did not seek. Such a pattern does not reflect a work environment that could

be characterized as objectively hostile.

Nor does the rest of Bowden's evidence, alone or in aggregate, support such a

characterization. Bowden contends that Amos and Quinlisk singled her out for criticism while

overlooking the unprofessional conduct of her Caucasian colleagues. Specifically, she asserts that

Quinlisk unfairly characterized her work on the Best Practices Guide as "horrible."[9] Even assuming

that such isolated criticisms were unfair and unwarranted, however, they were not sufficiently

serious to create a hostile work environment. *See, e.g., Patton v. Indianapolis Pub. Sch. Bd.,* 276

F.3d 334, 339 (7th Cir. 2002) (allegations that supervisor was "rude, abrupt, and arrogant" and

subjected employee to "stern and severe criticism" were not sufficiently severe or pervasive to

---

[9]    In fact, as the court reads the record, Quinlisk simply noted that one of the exemplars Bowden had selected for inclusion in the Guide was in "horrible" shape, in that it contained several errors.

support hostile environment claim)*; Whigum v. Keller Crescent Co.*, 260 Fed.Appx. 910, 914 (7th Cir. 2008) (a mere "handful" of "unprofessional" remarks and criticisms from a supervisor were insufficient to establish hostile work environment.)   In this case, Bowden has not even demonstrated that Quinlisk's various remarks were unprofessional, let alone severe, pervasive, or racially-motivated.  In fact, the record demonstrates that Kirkland's evaluation of Bowden's work was, by and large, complimentary.  Bowden was given raises, bonuses, and favorable evaluations throughout the relevant time period, and Quinlisk herself characterized Bowden's work as "exceptional."   Quinlisk even rapidly backed off her isolated criticism of Bowden's performance on the Best Practices Guide, referring to her statement as merely an "update" and "not a big deal." The subsequent escalation of the exchange appears to have been driven by Bowden's overreaction to an innocuous critique.

Nor are the generally unfriendly attitudes and behaviors of Bowden's co-workers sufficient to establish a hostile environment.  Receiving the cold shoulder from one's colleagues may be the paradigmatic example of a "petty slight" that does not rise to the level of objective hostility.   In addition, there is no evidence that the behavior of Bowden's co-workers was either condoned by her superiors or racially motivated.  The fact that other Kirkland employees–Caucasian employees among them–enjoyed better relationships with one another and their supervisors does not support the inference that Bowden was singled out for hostility because of her race.  Bowden testified that she was treated coldly by African-American and Caucasian co-workers alike (Bowden Dep. at 232), and there is no evidence that any Kirkland employee ever made reference to Bowden's race or her complaints as the basis of their criticism, exclusion, or general feelings about Bowden.  *See McKenzie v. Milwaukee County*, 381 F.3d 619, 624 (7th Cir. 2004) (behavior that is "standoffish," "unfriendly," and "unapproachable" is insufficient to establish an objectively hostile work environment).   Under the circumstances, Bowden has not shown that strained relationships with her co-workers or her superiors were attributable to racial animus or retaliation for her complaints.

Instead, Bowden's evidence tends to support the conclusion that, assuming she was mistreated by her co-workers, such treatment was likely motivated by the type of mundane personal resentments that are common to the workplace; such personal antipathies are not actionable under Title VII.

**B.      Bowden's Evidence Under the "Indirect Method" of Proof**

Next, the court analyzes Bowden's claims under the "indirect" or "burden-shifting" method of proof.  Because Bowden does not present direct evidence of discrimination or retaliation, she must attempt to establish her *prima facie* case under the indirect method outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  To establish a *prima facie* case for discrimination, Bowden must prove that (1) she is a member of a protected class; (2) her job performance met her employer's legitimate expectations; (3) she was subject to a materially adverse employment action; and (4) the employer treated similarly situated employees outside the protected class more favorably.  *Ballance v. City of Springfield*, 424 F.3d 614, 617 (7th Cir. 2005).  Bowden must "more or less" prove the same four elements to establish her retaliation claim.  *Dear v. Shinseki*, 578 F.3d 605, 611 (7th Cir. 2009).  The only difference is that the first element of the retaliation claim calls on Bowden to prove that she engaged in a statutorily protected activity, and the last element requires evidence that similarly situated employees who did not engage in that protected activity were treated more favorably.  *Id.* (citing *Sitar v. Ind. Dept. of Transp.*, 344 F.3d 720, 728 (7th Cir. 2003)).

Bowden complains of a number of incidents that occurred between 2004 and 2006, both before and after she filed her EEOC charge and internal complaint, and she does not neatly delineate which of these acts were motivated by discrimination and which were motivated by retaliation.  The acts she complains of, however, satisfy neither the "materially adverse" standard applicable under a discrimination analysis nor the retaliation standard, which examines whether the

acts were capable of "dissuad[ing] a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern*, 548 U.S. at 68. To be materially adverse, an employment action must be "more than 'a mere inconvenience or an alteration in job responsibilities.'" *Oest v. Ill. Dept. of Corr.*, 240 F.3d 605, 612 (7th Cir 2001). "An employee's unhappiness with her employer's conduct or decision is insufficient to support a claim under Title VII." *De la Rama v. Illinois Dept. of Human Services*, 541 F.3d 681, 686 (7th Cir. 2008) (citing *Traylor v. Brown*, 295 F.3d 783, 788 (7th Cir.2002)). Rather, the employee must be able to show a quantitative or qualitative change in the terms or conditions of employment, such as "a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities or other indices that might be unique to a particular situation." *Id.* (quoting *Oest*, 240 F.3d at 612-13); *Haywood v. Lucent Technologies, Inc.*, 323 F.3d 524, 532 (7th Cir. 2003). As already stated, to constitute retaliation an action must be such that it would have dissuaded a reasonable employee from asserting or supporting a claim of discrimination. *Burlington Northern,* 548 U.S. at 68. A change to job function or reassignment that does not affect "pay or promotion opportunities lacks this potential to dissuade and thus is not actionable." *Washington v. Illinois Dept. of Revenue*, 420 F.3d 658, 662 (7th Cir. 2005).

Bowden's gripes about the work projects she was assigned or not assigned do not implicate a material change in the terms or conditions of her employment. *See Lapka v. Chertoff*, 517 F.3d 974, 989 (7th Cir. 2008) (changes in workload or assignments did not significantly alter job responsibilities); *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 539 (7th Cir 2007) ("[H]arder work assignments do not constitute an adverse employment action."). Bowden offers no evidence other than her own conjecture that the training and other responsibilities she claims to have been denied somehow impaired her opportunities for advancement or professional development. *See Traylor*, 295 F.3d at 789 (failure to assign an employee additional duties was not materially adverse where the employee suffered no loss in title or job responsibility and the  employment consequences of

24

the assigned duties were merely speculative). And Bowden herself admits that she never requested or otherwise sought out such additional opportunities.

Nor does the mere fact that Bowden was criticized by her superiors, even if unfairly, constitute a materially adverse action. Negative evaluations or criticisms that do not result in tangible job consequences are not actionable under Title VII. *Whittaker v. Northern Illinois University*, 424 F.3d 640, 648 (7th Cir. 2005). This is partly because "while one might argue that 'each oral or written reprimand brought [the plaintiff] closer to termination[,][s]uch a course was not an inevitable consequence of every reprimand . . .; [rather,] job-related criticism can prompt an employee to improve her performance and thus lead to a new and more constructive employment relationship." *Id.* (quoting *Oest*, 240 F.3d at 613.) Even the "Final Warning," the lone formal disciplinary notice that Bowden received, resulted in no tangible job consequences. At most, the warning required that Bowden abide strictly by Kirkland's rules. As Bowden testified, the only negative consequence that she suffered as a result of the warning was that she lost the "freedom . . . to come in a minute late or two minutes late or have attendance issues" without worrying that she might be terminated. (Bowden Dep. at 150.) The "freedom" of an employee to fall short of her employer's legitimate attendance and performance expectations is not an interest protected by Title VII. Bowden's worries aside, there is no dispute that she suffered no further adverse consequences as a result of the warning. She received multiple pay raises, bonuses, and favorable performance ratings, and continued to work at Kirkland without a disciplinary infraction for almost another year and a half. Moreover, Bowden filed her EEOC charge nine days *after* she received the final warning, demonstrating that the warning did not dissuade her from engaging in further statutorily protected activity. Under the circumstances, the court concludes that the final warning can not be considered a materially adverse employment action, nor would it have deterred a reasonable person from engaging in protected activity.

## C.    Bowden's "Constructive Discharge"

The lone occurrence that could potentially rise to the level of a material change in Bowden's employment status is her resignation in February 2007.  Bowden's complaint claims that she was constructively discharged from her position at Kirkland.  The evidence defeats this claim, as well.  In a constructive discharge, the employee is not fired but resigns because the working conditions have made remaining with the employer simply intolerable.  *McPherson v. City of Waukegan*, 379 F.3d 430, 440 (7th Cir 2004) (citing *Lindale v. Tokheim Corp.*, 145 F.3d 953, 955 (7th Cir. 1998)).  In order to establish that she was constructively discharged, Bowden must demonstrate both that a hostile work environment existed and that the abusive working environment was so intolerable that her resignation was an appropriate and reasonable response.  *Pennsylvania State Police v. Suders*, 542 U.S. 129, 147 (2004).   "[W]orking conditions for constructive discharge must be even more egregious than the high standard for hostile work environment because . . . an employee is expected to remain employed while seeking redress." *McPherson*, 379 F.3d at 440 (citing *Robinson v. Sappington*, 351 F.3d 317, 336 (7th Cir. 2003)).   As stated in Section A, Bowden has not established that she was subjected to a hostile work environment.  Thus, her claim of constructive discharge must also fail.  Bowden has produced no evidence to demonstrate that the conditions of her employment were intolerable.[10]  She remained in her position for more than a year after filing her EEOC charge, during which time she received raises, bonuses, and praise for her work.  She did not complain of any further problems with Quinlisk or Amos.  At the time that Bowden tendered her resignation, she had been applying and interviewing for jobs with Kirkland's competitors for two months and had recently received an offer of comparable employment at another law firm.  Under the circumstances, Bowden has failed to establish that her departure from Kirkland was the result

---

[10]    As the court explains in its companion opinion, Bowden's central contention–that she was forced to resign as a response to Kirkland's supposed eavesdropping on her private telephone conversations–lacks any evidentiary support.  There is no non-speculative evidence that such eavesdropping ever occurred.

of constructive discharge. *See Herron v. DaimlerChysler Corp.*, 388 F.3d 293, 303 (7th Cir. 2004) (employee who left employer several months after filing an EEOC charge and after having secured a comparable job elsewhere had failed to demonstrate an intolerable work environment.)

## III.     Gagen's Retaliation Claim

Title VII protects employees from retaliation for "complaining about the types of discrimination that it prohibits." *Miller v. American Family Mut. Ins. Co.*, 203 F.3d 997, 1007 (7th Cir. 2000). Nancy Gagen's invocation of this protection presents a hodgepodge of work-related complaints, many of which are not materially adverse employment actions and which bear no clear relationship to any statutorily protected activity. Like Bowden, Gagen has failed to establish the necessary elements of her claim.

### A.     Statutorily Protected Activity

To begin, it is unclear what statutorily protected activity Gagen contends was the catalyst for the alleged retaliation. Gagen points first to her complaint that Rampich "discuss[ed Gagen] in a derogatory manner in front of others." While that complaint states that Gagen believed she had been subjected to "a hostile work environment," it goes on to explain that the "hostility" Gagen is referring to involves only an interpersonal dispute between Gagen and a few Caucasian colleagues. The complaint makes no reference to Bowden, to race discrimination, to harassment based on race, or to anything else that appears to fall within the purview of Title VII discrimination. The firm responded to Gagen's complaint by holding a department meeting to emphasize the importance of teamwork and cordiality in the workplace. Neither at that meeting nor in any subsequent complaint did Gagen ever raise concerns about racial discrimination or retaliation. Gagen's complaint that Rampich badmouthed her does not amount to statutorily protected activity that can sustain a retaliation claim. Merely complaining in general terms about harassment, without identifying a connection to a protected class or providing facts sufficient to create that inference,

is insufficient to support a retaliation claim under Title VII. *See Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir 2006).

In the alternative, Gagen claims that her support for Bowden serves as the basis of her retaliation claim. Gagen did not file any complaints on Bowden's behalf, however, and Bowden's own internal complaints and EEOC charges do not suggest Gagen's assistance or endorsement. To the extent Gagen contends that her mere affiliation with Bowden constitutes statutorily protected activity, her claim fails as a matter of law. Providing spiritual guidance or friendship to a complaining co-worker is not protected activity. *Drake v. Minnesota Min. & Mfg. Co.*, 134 F.3d 878, 886 (7th Cir. 1998). Gagen, however, asserts that her participation in the complaints was more comprehensive than mere affiliation or the provision of spiritual guidance. She claims that she (1) consulted with Bowden in private and agreed that racial discrimination was a problem at Kirkland, (2) initially instructed Bowden to contact a lawyer, (3) urged Bowden to file EEOC charges, and (4) compiled materials that Bowden ultimately presented to the EEOC. The language of Title VII extends protection from discrimination to all who "participate" or "assist" in opposing prohibited discrimination. *See, e.g., Eichman v. Indiana State University Bd. of Trustees*, 597 F.2d 1104, 1107 (7th Cir. 1979). Viewing the evidence in the light most favorable to Gagen, the court infers that Gagen did indeed *assist* Bowden's charge. That conclusion is of no assistance here, however, because, as discussed below, Gagen has no non-speculative evidence that the assistance she provided to Bowden was causally related to any subsequent acts of alleged retaliation.

### B.     The Lack of a Causal Relationship

Beginning in summer 2005, Gagen asserts, she was consistently harassed by Rampich and a handful of her other co-workers. This harassment predates Bowden's complaint and EEOC charge by months, and so it could not have been a product of retaliation. In addition, the "harassment," which Gagen admits involved little more than the occasional smirk or dirty look, was

neither severe nor pervasive. Gagen did ultimately lose her job, but she cannot show that Kirkland fired her because she assisted Bowden in filing her complaints. Most importantly, there is no evidence from which a trier of fact could infer that anyone at Kirkland had knowledge of Gagen's assistance to Bowden. Gagen testified that she did not reveal to anyone at Kirkland that she had assisted Bowden's complaints until after she had been terminated. No one on Kirkland's staff ever questioned Gagen in connection with Bowden's complaints, and nothing in the substance of those complaints hints at Gagen's involvement. Gagen speculates that the firm must have learned of her participation by eavesdropping on her private telephone conversations with Bowden, but there is no basis in fact to support this contention. Plaintiffs have not met their evidentiary burden to show that Kirkland was even technically capable of eavesdropping on telephone calls.

Because Gagen presents no non-speculative evidence that Kirkland was even aware of her participation in the protected activity, she cannot demonstrate a causal nexus between the protected activity and her termination. "[A]n employer cannot retaliate when it is unaware of any complaints." *Sitar*, 344 F.3d at 727 (quoting *Miller*, 203 F.3d at 1008); *Salas v. Wisconsin Dept. of Corrections*, 493 F.3d 913, 925 (7th Cir. 2007) (plaintiff failed to prove causal nexus for retaliation where he presented no evidence that his employer knew of his protected activities). Gagen was fired in March 2006, more than six months after she claims that she engaged in protected activity by assisting Bowden. Such a substantial time lapse is inconsistent with any causal connection between the protected activity and the adverse employment action. *See Masupha v. Mineta*, 551 F.Supp.2d 730, 742 (N.D.Ill. 2008) (collecting cases). Kirkland gave a facially valid reason for its dismissal of Gagen: there was credible evidence–in the form of Tilton's e-mail–that Gagen revealed internal personnel information and discussed her personal dislike for her bosses with an employee of another law firm. Gagen's speculation that this evidence was somehow a ruse or a setup orchestrated as a pretext to support her termination finds no support in the record. Gagen's claim fails as a matter of law.

## **CONCLUSION**

Defendant's motions for summary judgment against Bowden [D.E. 203 in Case No. 07 C 975] and Gagen [D.E. 127 in Case No. 07 C 979] are granted.

ENTER:

Dated:      September 2, 2010

REBECCA R. PALLMEYER
United States District Judge